UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TONY KHONG,<br><br>　　　　Petitioner,<br><br>　　v.<br><br>SCOTT FRAUENHEIM,<br><br>　　　　Respondent. | No. 2:18-cv-0580 KJM DB P<br><br><br>FINDINGS AND RECOMMENDATIONS |

Petitioner is a state prisoner proceeding pro se and in forma pauperis with a petition for a writ of habeas corpus under 28 U.S.C. § 2254. Petitioner challenges his conviction imposed by the Sacramento County Superior Court in 2014 for two counts of pimping a minor under 16 years of age in violation of Cal. Penal Code § 266h(b)(2); one count of pandering a minor under 16 years of age in violation of Cal. Penal Code § 266i(b)(2); and two counts of human trafficking a minor in violation of Cal. Penal Code § 236.1(c)(1). Petitioner alleges the prosecution withheld evidence in violation of <u>Brady v. Maryland</u>. For the reasons set forth below, this court will recommend the petition be denied.

## BACKGROUND

**I.     Facts Established at Trial**

The California Court of Appeal for the Third Appellate District provided the following factual summary:

1

**The People's Case–in–Chief**

S.T., a minor, was 17 years old at the time of trial. In 2011, when S.T. was 15 years old, she met a girl named C.T., also a minor. On a day approximately three weeks after S.T. met C.T., she received a text from C.T. asking her to pick her up from a gas station in Elk Grove. At the time, S.T. was with her friends Tyrone Tran, whom she had known for five years, and defendant, whom she had just met that day through Tyrone. Defendant, Tyrone, and S.T. went to pick up C.T. in defendant's car. Defendant then dropped S.T. off at her home.

Approximately one week later, S.T. decided to run away. She was experiencing difficulties at home; she testified that her mother "was not really mom material." When she decided to run away, S.T. called Tyrone and asked him to pick her up. Tyrone took S.T. to his house. A day or so later, S.T. again met up with C.T., and they began to spend time together.

Having run away from home, S.T. moved around to "[l]ots of places." She did not have a job or any way to earn a paycheck, and C.T. bought food for her. S.T. did not know how C.T. made money, but she did sometimes see C.T. leave with defendant to go somewhere. Defendant would be talking on the phone and he would leave the room. When he returned, he would tell C.T. that she had work. C.T. would leave with defendant, and she would return approximately an hour later. S.T. did not know where C.T. would go, but when she returned, C.T. would have money and food.

At some point during the time between October and December 2011, defendant had a conversation with S.T. about how she could earn money. Defendant told S.T. that she "could either do this or [she] can just work at the strip bar." When defendant stated she could "do this," S.T. assumed that he was referring to prostitution. She had never engaged in prostitution before. S.T. knew it was wrong, she did not want to do it, and she knew that it would be a bad decision, but she felt pressured. S.T. initially refused.

C.T. continued to pay for S.T.'s food. Approximately two weeks after defendant's conversation with S.T., C.T. talked to S.T. and asked S.T. to help her. C.T. told S.T. that they both had to "do this in order to have a living." S.T. felt bad that C.T. continued to provide food for her. She felt that she could no longer let C.T. do everything for her, and that she needed to contribute. After considering the matter for some time, S.T. "decided to do it." Thereafter, she engaged in approximately 30 acts of prostitution.

S.T. did not find her own customers. Defendant made the arrangements. Defendant would receive a call, leave the room, return, and tell S.T. and C.T. that they had work. Defendant was the only person who told her when she had work. Defendant, Tyrone, or Stephen Tran would drive them to their destination, usually a motel. Sometimes Stephen would drive her to customers' homes. Tyrone had introduced S.T. to Stephen Tran at some point after S.T. had run

away. If Tyrone or Stephen drove, defendant would tell them what to do. She never saw Tyrone or Stephen make the arrangements.

At the motel, a man would be waiting out front. They would follow the man to a motel room. Once in the room, they would not discuss with the man how much certain acts would cost. Instead, they would "just automatically do it," meaning either vaginal or anal intercourse. Sometimes S.T. and C.T. would go together, and other times they would go individually. When they went together, one of them would have intercourse with a customer while the other waited outside. S.T. would use condoms provided by defendant, Tyrone, or Stephen. After engaging in intercourse with S.T., the man would give money either to S.T. or to defendant. Defendant would be waiting outside when they were done. S.T. would receive $40 for each occurrence. She would give defendant $20. The amount of money she gave defendant was "[d]ue to the sex act." When asked why she gave defendant $20, S.T. said, "It was for respect. For me, he let me sleep over. He gave me a roof over my head. He gave me food. [¶] I mean, he gave me a living, like, although it was hard for me." S.T. would keep the other $20. S.T. testified that she also bought food for defendant, also for "[r]espect." S.T. never gave Tyrone or Stephen money when they drove her. S.T. engaged in prostitution from approximately October 2011 to December 2011.

During this period of time, S.T. was staying at defendant's house and Tyrone's house. When she stayed at defendant's house, she stayed in his room with him. S.T. testified that defendant's bedroom was on the ground floor, "[r]ight next to" the garage. They entered the home through the garage. C.T. would sometimes stay in that room as well. They would all sleep in defendant's bed. S.T. testified at trial that she had sex with defendant on one occasion.[fn] Defendant told her that he was "testing [her] to see if it was easy for [her] to have sex with clients." S.T. was not sure whether she ever saw defendant and C.T. having intercourse. However, S.T. saw "a lot of movements on the bed," leading her to believe that defendant had sex with C.T.

Eventually, S.T. stopped participating in prostitution. S.T. was at defendant's house when defendant told her that C.T. and Stephen had been contacted by a police officer and that they had to go because S.T. and C.T. were "hot right now." S.T. assumed that meant that the police were looking for them. Defendant took S.T. to Tyrone's house. That was the last time S.T. saw defendant until trial.

Detective Derek Stigerts, assigned to the FBI's Innocence Lost Task Force dealing with juvenile prostitution cases, testified as an expert in juvenile prostitution. Among other things, Stigerts testified that it was uncommon for prostitutes to buy food for their pimp out of respect. He testified that, customarily, pimps have the money, and therefore "it's usually the other way around ...," although he testified that he had "seen where it does happen."

Officer Noah Winchester of the Los Rios Police Department, which worked directly for the Los Rios Community College District, testified that, on December 7, 2011, he was on patrol at Cosumnes River College. A vehicle drove by playing loud music. Winchester

3

initiated a traffic stop. The driver of the vehicle appeared to be nervous. Winchester identified the driver as Stephen. A female passenger, who looked very young and who Winchester thought may be truant from a local school, appeared to be "overly nervous." Her hands were shaking, her eyes were darting around, and she could not sit still. Winchester asked the passenger to step away from the vehicle and accompany him to his vehicle. She initially told Winchester her name was S.T. After Winchester warned her that providing false information to the police is a crime, the passenger stated that her name was C.T., and gave her date of birth, indicating that she was 14 years old. Winchester searched C.T.'s purse and discovered several emergency contraceptive pills, 20 to 30 condoms, and other items of that nature. Winchester placed C.T. in the back of his patrol car and returned to Stephen.

Winchester noticed that Stephen's phone was ringing continuously. Stephen gave Winchester permission to look at his phone, and Winchester observed that there were a number of missed calls. The caller ID identified the caller as "Tony Khong." Additionally, Winchester saw a text message on the phone from "Tony Khong" which read, "grab the girl and dip, Nigga." In Winchester's experience, that message would be telling the recipient to "go, run." Winchester testified that this text message was received during the time the vehicle stop was ongoing. Winchester obtained a photograph of defendant and showed it to C.T. She identified the individual in the photograph as defendant. Winchester contacted C.T.'s father, as C.T. had been reported missing on November 10, 2011.

C.T.'s father testified that he was contacted by the Los Rios Police Department on December 7, 2011, and that the police indicated that they had his missing daughter. He picked her up and returned with her to their home in Oroville.

Sergeant Jeff Morris of the Sacramento Police Department testified that, on or around December 19, 2011, he began investigating allegations of pimping, pandering, and human trafficking of minors by defendant. Morris spoke with Winchester about his encounter with Stephen and C.T. Morris obtained a statement from C.T. on January 17, 2012, at her residence in Oroville. At that time, C.T. was 15 years old. A little over a month later, Morris interviewed S.T. at her residence. She was also 15 years old at that time.

Eventually, C.T. ran away from home again. At the time of trial, C.T.'s father had not spoken with her in about a week, and he had not seen her for three months. He did not know her whereabouts.

Cathy Barker was employed by the Sacramento County District Attorney's Office, and she was assigned to assist in the investigation of this case. She had met with C.T. three times between March and June 2013. Barker described her subsequent attempts to get C.T. to appear at the preliminary hearing in this case. On the night before the preliminary hearing, C.T. contacted Barker and told her that she would appear at the hearing, but, the following day, she did not show up. Barker and other authorities continued to look for C.T. as the trial

4

date approached, but they were unable to find her, and she did not testify at trial.

**Defendant's Case**

Muey Saetern testified that she was married to defendant's brother. Until 2013, she and her husband and their four children lived in the same house as defendant as well as defendant's father. As of October 2011, Saetern only worked a few days a month, and, otherwise, she would be at home. Saetern testified that, during the period between October and December 2011, she never saw defendant bring any girls home. She testified that, had defendant brought girls or women home, she would have remembered it. Saetern had not heard of C.T. or S.T., and she never saw either of those girls at the house. However, Saetern also testified that defendant's bedroom was on the ground floor and all the other bedrooms were on the second floor. She also said defendant's room was located near the door to the garage.

Lani Khong, defendant's sister, testified that she was at the house in which defendant lived three or four times a week during the period between October and December 2011. She never saw defendant bring girls to the residence. Lani had not heard of C.T. or S.T. Lani testified that there was a general restriction in the house that defendant could not have people over because of the children who lived there.

**Stipulation**

The prosecution and the defense stipulated that, if Detective Morris was recalled, "he would testify that on February the 6th of 2012, he contacted Muey Saetern at the ... residence [where defendant lived], wherein she stated that [defendant] does not work and gets home late at night and leaves the residence in the morning."

[fn] At the preliminary hearing, S.T. testified that she did not recall ever having sex with defendant.

People v. Khong, No. C076416, 2016 WL 3343738, at **2-4 (Cal. Ct. App. June 8, 2016) (some footnotes omitted).

## II. Procedural Background

### A. Judgment and Sentencing

The jury returned verdicts finding defendant guilty of two counts of pimping a minor under 16 years of age, one count of pandering a minor under 16 years of age, and two counts of human trafficking a minor. The jury found defendant not guilty of one count of pandering a minor under 16 years of age. The jury could not reach a verdict on count five, unlawful sexual intercourse with a minor under 16 years of age (§ 261.5, subd. (d)), and the trial court declared a

5

mistrial as to that count. On the prosecution's motion, count five was later dismissed in the interest of justice. The trial court sentenced defendant to an aggregate term of 20 years. See Khong, 2016 WL 3343738, at *4.

**B. State Appeal, State Post-Conviction and Federal Proceedings**

Petitioner filed an appeal in which he raised claims not raised here. The Court of Appeal modified petitioner's sentence, but upheld the judgment in all other respects. Khong, 2016 WL 3343738, at *17. Petitioner did not seek review in the California Supreme Court.

On April 10, 2017, petitioner, through counsel, filed a petition for writ of habeas corpus in the Sacramento County Superior Court. (Lodged Document "LD" 3 (ECF No. 14-3).) In the petition, and in each subsequent state petition, petitioner raised the Brady claim he raises here. The superior court denied the petition on the merits in a reasoned decision on June 6, 2017. (Ex. 2 to Answer (ECF No. 12-2).)

On July 28, 2017, petitioner filed a petition for writ of habeas corpus with the California Court of Appeal. (LD 4 (ECF No. 14-4).) Respondent filed an informal response and petitioner filed a reply. (LD 5, 6 (ECF Nos. 14-5, 14-6).) The Court of Appeal summarily denied the petition on October 5, 2017. (Ex. 3 to Answer (ECF No. 12-3).)

Petitioner filed a petition for writ of habeas corpus with the California Supreme Court on November 29, 2017. (LD 7 (ECF No. 14-7).) On February 14, 2018, that court summarily denied the petition with a citation to People v. Duvall, 9 Cal. 4th 464, 474 (1995). (Ex. 4 to Answer (ECF No. 12-4).)

Petitioner filed the present federal petition on March 16, 2018. (ECF No. 1.) Respondent filed an answer (ECF No. 12) and petitioner filed a traverse (ECF No. 16.)

**STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'" Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (citing Parker v. Matthews, 567 U.S. 37 (2012)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Id. at 1451. Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. Carey v. Musladin, 549 U.S. 70, 76-77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting Williams, 529 U.S. at 405-06). "Under the 'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct

7

governing legal principle from th[e] [Supreme] Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, 529 U.S. at 411; see also Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Andrade, 538 U.S. at 75 ("It is not enough that a federal habeas court, in its independent review of the legal question, is left with a firm conviction that the state court was erroneous." (Internal citations and quotation marks omitted.)). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103.

There are two ways a petitioner may satisfy subsection (d)(2). Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir. 2012). He may show the state court's findings of fact "were not supported by substantial evidence in the state court record" or he may "challenge the fact-finding process itself on the ground it was deficient in some material way." Id. (citing Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004)); see also Hurles v. Ryan, 752 F.3d 768, 790-91 (9th Cir. 2014) (If a state court makes factual findings without an opportunity for the petitioner to present evidence, the fact-finding process may be deficient and the state court opinion may not be entitled to deference.). Under the "substantial evidence" test, the court asks whether "an appellate panel, applying the normal standards of appellate review," could reasonably conclude that the finding is supported by the record. Hibbler, 693 F.3d at 1146 (9th Cir. 2012).

The second test, whether the state court's fact-finding process is insufficient, requires the federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-

8

finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)). The state court's failure to hold an evidentiary hearing does not automatically render its fact-finding process unreasonable. Id. at 1147. Further, a state court may make factual findings without an evidentiary hearing if "the record conclusively establishes a fact or where petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459 F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

If a petitioner overcomes one of the hurdles posed by section 2254(d), this court reviews the merits of the claim de novo. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised."). For the claims upon which petitioner seeks to present evidence, petitioner must meet the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State court proceedings" and by meeting the federal case law standards for the presentation of evidence in a federal habeas proceeding. See Cullen v. Pinholster, 563 U.S. 170, 186 (2011).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, [this court] may consider both decisions to 'fully ascertain the reasoning of the last decision.'" Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99-100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. Johnson v. Williams, 568 U.S. 289, 293 (2013). When it is clear that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).

**ANALYSIS**

Petitioner contends the prosecutor withheld evidence that could have been used to impeach prosecution witness Winchester. Petitioner presents a copy of a Sacramento Bee article reporting that prior to 2014, the time of petitioner's trial, the Sacramento Police Department investigated allegations that Winchester had committed a sexual assault. The article, published sometime after 2014, described the Sacramento Police Department investigation as ongoing. It is apparent that, at the time of petitioner's trial, no charges had been filed against Winchester as a result of that investigation. (ECF No. 1 at 17-19.)

**I.    Legal Standards for Brady Claim**

In Brady v. Maryland, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963); see also Bailey v. Rae, 339 F.3d 1107, 1113 (9th Cir. 2003). The duty to disclose such evidence is applicable even though there has been no request by the accused, United States v. Agurs, 427 U.S. 97, 107 (1976), and encompasses impeachment evidence as well as exculpatory evidence, United States v. Bagley, 473 U.S. 667, 676 (1985).

A Brady violation may also occur when the government fails to turn over evidence that is "known only to police investigators and not to the prosecutor." Youngblood v. West Virginia, 547 U.S. 867, 870 (2006) (quoting Kyles v. Whitley, 514 U.S. 419, 437 (2006)). "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." Kyles, 514 U.S. at 437. To prove a

10

Brady violation, a petitioner must show three things: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999); see also Banks v. Dretke, 540 U.S. 668, 691 (2004); Silva v. Brown, 416 F.3d 980, 985 (9th Cir. 2005).

A defendant is prejudiced by a Brady violation if the undisclosed evidence is material. Strickler, 527 U.S. at 288-89. Evidence is material if "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." Id. at 289. "The question is not whether petitioner would more likely than not have received a different verdict with the evidence, but whether "in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Id. (quoting Kyles, 514 U.S. at 434); see also Silva, 416 F.3d at 986 ("a Brady violation is established where there 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'") "Materiality pertains to the issue of guilt or innocence, and not to the defendant's ability to prepare for trial." Agurs, 427 U.S. at 112 n. 20. Once the materiality of the suppressed evidence is established, no further harmless error analysis is required. Kyles, 514 U.S. at 435-36; Silva, 416 F.3d at 986. "When the government has suppressed material evidence favorable to the defendant, the conviction must be set aside." Silva, 416 F.3d at 986.

**II.     State Court Decision**

The California Supreme Court's summarily denied petitioner's petition with the following statement: "The petition for writ of habeas corpus is denied. (See People v. Duvall (1995) 9 Cal.4th 464, 474 [a petition for writ of habeas corpus must include copies of reasonably available documentary evidence].)" (ECF No. 12-4 at 2.) Respondent argues that the California Supreme Court's denial is based on the merits. (See ECF No. 12 at 10-11.) That is not the case. The Ninth Circuit has "consistently found that citation to Duvall . . . stand[s] for the proposition that the petitioner's habeas petition was deficiently pled, which is a procedural defect." See Sherwood v. Sherman, 734 F. App'x 471, 473 n. 1 (9th Cir. 2018) (citing Curiel v. Miller, 830 F.3d 864, 870-71 (9th Cir. 2016) (other citations omitted)).

11

To the extent the California Supreme Court's decision constitutes a procedural default of his federal claim, this court need not reach that issue if addressing the merits is a less complex task.[1] See Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002). Further, petitioner's claim may be considered unexhausted because he failed to give the state court a sufficient basis to rule upon it. See Picard v. Connor, 404 U.S. 270, 276 (1971) (to exhaust a habeas claim, a petitioner must give the state's highest court a "fair opportunity" to rule on the merits of the claim). This court may not grant, but may deny, an unexhausted claim. See 28 U.S.C. § 2254(b)(1) and (b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

When reaching the merits of petitioner's claim, there is some question whether this court should conduct de novo review because the California Supreme Court did not address the merits or whether this court should look through to the last reasoned decision of a state court. Because this court conducts de novo review below, it necessarily also finds petitioner's claims fail under the deferential standard set out in 28 U.S.C. § 2254(d). See Sexton v. Cozner, 679 F.3d 1150, 1156 (9th Cir. 2012) (noting that where a claim fails under de novo review "it necessarily fails under AEDPA's deferential review.").

**III. Analysis**

Petitioner's claim fails because he has not met one of the requirements of proving a Brady claim. He has not shown the impeachment of Winchester's testimony was material to the verdict. As set out above, under Brady, evidence is material when "'there is a reasonable probability' that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." Strickler, 527 U.S. at 289. Petitioner argues that this materiality standard does not apply to impeachment evidence. That is incorrect. The Supreme Court in Bagley considered what sort of materiality standard should apply to the prosecution's withholding of impeachment

---

[1] It is unlikely that the citation to Duvall constitutes a procedural default that should be recognized by this court. The citation indicates that petitioner could have attempted to renew his petition before the California Supreme Court to cure its defects. Therefore, his claims were not procedurally barred as a matter of state law. See Cross v. Sisto, 676 F.3d 1172, 1177 (9th Cir. 2012).

12

evidence. The Court adopted the Brady standard, holding that impeachment evidence is "material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Bagley, 473 U.S. at 682. Therefore, to succeed on his claim, petitioner must establish that if Winchester had been impeached with evidence of the investigation of the sexual assault allegations, there is a reasonable probability the result of the trial would have been different.[2]

Petitioner points out that Winchester testified about what C.T. told him. Because C.T. was unavailable and did not testify at trial, Winchester's testimony was, according to petitioner, particularly important. However, Winchester testimony about C.T. was limited. Winchester testified that C.T. appeared "overly nervous" because her hands were shaking," her "eyes were darting around," and she "couldn't sit still inside the vehicle." (RT 325 (ECF No. 14-9 at 276).) He testified that, when asked, C.T. initially lied about her age and name. (RT 327-28.) When Winchester warned C.T. that lying to the police was illegal, she provided her name and date of birth. (RT 328.) She was fourteen years old at the time. (Id.) Winchester then searched C.T.'s purse and discovered emergency contraceptive pills and condoms. (RT 329.) After Winchester saw the name "Tony Khong" on Stephen Tran's phone, he obtained a picture of Tony Khong. Winchester showed C.T. this picture of petitioner, which she identified as being "Tony Khong." (RT 335-36.) In discussions with C.T., Winchester learned that she had been reported missing. He then contacted C.T.'s father to tell him C.T. was with him. (RT 336-37.)

The other teenage victim, S.T., testified at trial. As set out above by the Court of Appeal, S.T. testified to the following: (1) C.T. was a minor, (2) petitioner arranged for S.T. and C.T. to meet up with customers for prostitution, (3) petitioner arranged transportation for S.T. and C.T. to meet customers, usually at a motel; and (4) she and C.T. would either go into the motel room together or one would go inside and have sex with the customer while the other waited outside.

////

---

[2] For purposes of this analysis, the court assumes, without finding, that had the defense received information about the investigation of Winchester, the trial court would have permitted its use as impeachment.

13

In his state court petition, petitioner argued that a jury note showed jurors were particularly concerned about Winchester's testimony. A review of the trial record does not support that interpretation of the juror's notes. During deliberations, jurors asked for "any testimony, comments, or discussion by Cindy T. that can be used as evidence in this case." (CT 275 (ECF No. 14-11 at 282).) After discussion with counsel, the court provided this response: The Court has ordered that the trial testimony of Stacey T. be transcribed and it will be read to you in its entirety. Also, the trial testimony of Officer Winchester will be transcribed and read to you in its entirety." (CT 276.) The jury then sent out a supplemental note requesting "only the cross-examination from the defense attorney of Stacey T testimony as well as the rebuttal from the Deputy District Attorney is all that we require. We don't need her entire testimony." (Id.) Shortly thereafter, the court received another communication from the jury. This one stated that the jury "no longer need Officer Winchester's testimony." (Id.) These notes indicate jurors were concerned about just what C.T. told S.T., but that what she told Winchester was not of the great concern.

Winchester did not testify that C.T. told him she was a prostitute; he did not testify that C.T. told him petitioner was the contact with customers; he did not testify that petitioner arranged transportation for C.T. to meet customers; and he did not testify that C.T. gave part of the money she earned to petitioner. All of that information was necessary to prove the pimping, pandering, and human trafficking charges. The charge of pimping a minor required a showing that the perpetrator knew a minor was a prostitute and either derived support from the proceeds of that person's prostitution or solicited the person for prostitution. Cal. Penal Code § 266h(b). The charge of pandering a minor can be established by proving that the perpetrator procured a minor for the purpose of prostitution or persuaded or encouraged a minor to become a prostitute. Cal. Penal Code § 266(a), (b). Finally, the charge of human trafficking can be proved by showing that the perpetrator induced or persuaded a minor to engage in a commercial sex act, with the intent to violate the laws against pandering or pimping. Cal. Penal Code § 236.1(c).

Winchester did not provide the information necessary to prove these charges. Rather, S.T.'s testimony about C.T.'s actions and her relationship with petitioner was the key to the

prosecution's case.  Even if the jury disbelieved everything Winchester testified to, there is no reasonable probability the result of the trial would have been different.  The prosecution's other evidence, primarily in the form of S.T.'s testimony, provided the jury with everything it needed to convict petitioner.  In fact, petitioner's trial attorney recognized that fact.  In his closing argument, he told the jury: "this case rests solely on the credibility and believability of Stacey T." (RT 647 (ECF No. 14-10 at 188).)  As the superior court pointed out, Winchester was significant to the investigation, but he was not significant to the conviction.  (See ECF No. 12-2.)

The impeachment evidence of the sexual assault investigation of Winchester was not material under Brady.

**CONCLUSION**

For the foregoing reasons, this court finds petitioner has failed to establish a constitutional violation.  Therefore, IT IS HEREBY RECOMMENDED that petitioner's petition for a writ of habeas corpus be denied.

These findings and recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within seven days after service of the objections.  The parties are advised that failure to file objections within the specified time may result in waiver of the right to appeal the district court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In the objections, the party may address whether a certificate of appealability should issue in the event an appeal of the judgment in this case is filed.  See Rule 11, Rules Governing § 2254 Cases (the

////
////
////
////
////

district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

Dated: June 10, 2019

_____
DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

DLB:9
DB/prisoner-habeas/khon0580.fr